589 P.2d 1321

**Daniel H. ESPEY, Petitioner,**

**v.**

**The INDUSTRIAL COMMISSION of Arizona, Respondent,**

**Magma Copper Company, Respondent Employer,**

**State Compensation Fund, Respondent Carrier.**

**No. 1 CA–IC 1905.**

Court of Appeals of Arizona, Division 1, Department C.

Nov. 24, 1978.

Rehearing Denied Dec. 29, 1978.

Review Denied Feb. 6, 1979.

---

1. *Klockenbrink v. State*, 472 P.2d 958 (Alaska 1970).

Davis, Eppstein & Tretschok, P. C. by Dale D. Tretschok, Tucson, for petitioner.

John H. Budd, Jr., Chief Counsel, Industrial Commission of Arizona, Phoenix, for respondent.

Twitty, Sievwright & Mills by N. Douglas Grimwood, Phoenix, for respondent Employer.

Robert K. Park, Chief Counsel, State Compensation Fund, Phoenix, for respondent Carrier.

## OPINION

NELSON, Judge.

Petitioner, Daniel H. Espey, questions an award of the Industrial Commission granting benefits for a scheduled 5% permanent partial impairment of the right major arm, contending that the award should have been for an unscheduled disability.

The industrial injury in question occurred on June 1, 1974, when Espey was working as a welder trainee for Magma Copper Company. A sander slipped out of his hand, causing a piece of steel to strike him in the arm, which resulted in the arm swelling. Espey underwent a fasciotomy at that time, which is a surgical excision of strips of the fibrous tissue around the muscles and nerves in the arm.

On about August 24, 1974, Espey returned to his employment with Magma and in the course of working with a machine that punches holes in steel, his arm again began to swell. Another fasciotomy was performed on August 27, 1974.

While recovering from this second surgical procedure, Espey's arm swelled as he was helping his wife move some furniture at home so she could vacuum. A third fasciotomy was performed after conservative treatment was determined to be unsuccessful.

On June 19, 1975, after returning to work for Magma, Espey turned over a beam in order to weld it and the swelling in his arm occurred again. After the swelling subsided, Espey was told to strengthen his arm by lifting weights. He attempted to follow this advice of his doctors, but on or about July 18, 1975, while lifting the recommended weights, his arm began to swell. Espey was then admitted to the University of Arizona Hospital, where nerve surgery was done to prevent the swelling from injuring the nerves in his arm.

Espey returned to work in October 1975, but on November 20, 1975, the swelling occurred while he was performing his duties as a welder. He was admitted to the hospital at the University of Arizona, where exploratory surgery was performed for diagnostic purposes only.

Further episodes of swelling occurred while Espey was putting chains on his car and while he was pushing his motorcycle into the shop. These episodes in mid-1976 were the last for almost a year because Espey performed no manual labor during that period.

On the advice of his physicians, who felt that perhaps the problem had resolved itself, Espey took a job with the United States Forest Service. In April 1977, while engaged in that employment, he was using an auger drill to make holes to plant trees when he felt a twinge of pain and the swelling again occurred.

Espey has not worked since this last episode of swelling and therefore no further incidents of swelling have occurred.

There is no dispute that the swelling is causally related to the industrial injury in 1974, but the physicians have been unable to discover an anatomical explanation for it. Agreement is also unanimous that Espey is precluded from doing any heavy manual labor or any power gripping with his right hand and arm.

Espey's employment with Magma was terminated in January 1976 because he was "medically unsuitable for industrial work", and except for his job with the Forest Service, he was unable to find any employment despite repeated efforts to do so with a number of firms in both Phoenix and Tucson. The only fields he has ever worked in involve manual labor, and his training is limited to vocational education in automotive engine rebuilding and the welder's training at Magma.

Without considering for a moment the question of the nature of Espey's disability, i. e., scheduled or unscheduled, it appears that he falls squarely within the "odd-lot doctrine" formulated by Professor Larson. This doctrine allows a finding of total disability where a worker is so handicapped that he will not be employed in any well-known branch of the labor market even though he is not totally incapacitated. 2 A. Larson, The Law of Workmen's Compensation, § 57.51 (1976 ed.); *Shroyer v. Industrial Commission*, 98 Ariz. 388, 405 P.2d 875 (1965).

Despite the fact that his medical condition effectively prevents him from successfully entering the labor market, the physicians who testified in the case could only rate the physical impairment at 5 percent. This is for the reason that there is very little loss of function when the arm is not swollen. John Ricker, M. D., gave the arm a 20–25 percent rating, which was rejected by the hearing officer because it was based in part on speculation as to what would happen in the future if Espey continued to use his arm. John W. Madden, M. D., rated the arm at 5 percent but testified that if Espey continued working, the loss of function could be about 75 percent in several years.

In this special action, Espey argues that all of these factors bring him within the exception to scheduled awards created by our Supreme Court in *Langbell v. Industrial Commission*, 111 Ariz. 328, 529 P.2d 227 (1974):

"We hold that when a workman suffers an industrial injury and as a direct result of that injury he is unable to perform his normal work activities without incurring a substantial risk of reinjury, then he does in fact have a permanent physical disability or loss of function within the meaning of the Workmen's Compensation Act.

\* \* \* \* \* \*

We are not concerned herein with a loss of vision. *Here we are concerned with a permanent physical disability or loss of function because of the risk to the eye.* Admitting that if the claimant went back to heavy construction the resulting reinjury to the eye might mean only a further scheduled disability, it does not follow that a scheduled disability award

for loss of eye is the limit of his recovery. The risk to the eye by heavy work is in effect an impairment of the whole function of the body preventing the claimant from seeking and holding gainful employment. We believe that the loss of function should be classified as unscheduled under subparagraphs C and D [of A.R.S. § 23–1044] rather than scheduled under subparagraphs A and B." 111 Ariz. at 331–32, 529 P.2d at 230–31. (Emphasis supplied).

It has been recognized that the doctrine enunciated in *Langbell* is a very limited one to be applied on a case-by-case basis. *Alvarado v. Industrial Commission*, 115 Ariz. 113, 563 P.2d 912 (App.1977), was a case where the claimant was prohibited from working around certain chemicals which periodically caused her to suffer from dermatitis. Noting that at the time of the hearing before the Industrial Commission the claimant was employed full-time and earning more than at the time of her injury, we said:

"*The distinguishing feature between Langbell and the instant case is the degree of permanent severity of the injury and the extent to which the workman is precluded from again engaging in gainful employment.* The fundamental thrust of *Langbell* is to provide permanent workmen's compensation benefits to a workman who sustains an injury which is not inherently disabling but which presents a substantial risk of re-aggravation with grave consequences such that he is forever precluded from seeking gainful employment. *Langbell* is a highly specialized case intended to be applied on a case by case basis; the universal application of its doctrine could open the floodgates to various specious claims for permanent disability founded upon specific maladies and allergic reactions disabling only to the extent that the workman is prevented from performing a specific task or engaging in a certain type of occupation." 115 Ariz. at 115, 563 P.2d at 914. (Emphasis supplied)

In this case, Mr. Espey risks losing the use of his arm every time he engages in any employment that he is trained to do. He testified, for instance, that the "easiest" job he had ever performed was as a janitor which involved carrying heavy buckets and tight gripping so as to be precluded from consideration in his current condition.

Further, Dr. Madden testified that Espey's condition was unique and that he had not seen one like it in 17 years of practice.

It is the stated policy of our workmen's compensation case law that we will not require a worker to subject himself to the risk of further injury by returning to his former employment. *Midland-Ross Corporation v. Industrial Commission*, 107 Ariz. 311, 486 P.2d 793 (1971); *Garrard v. Industrial Commission*, 6 Ariz.App. 373, 432 P.2d 921 (1967). In this case even more than in *Langbell*, it is uncontroverted—and indeed a proven fact—that returning to work inevitably results in reinjury which will eventually result in an almost total loss of use of Espey's right arm.

We are faced with a situation where a man is totally precluded from engaging in any work which could require any more than light use of the right arm, has a condition which will inevitably become worse if he works, yet has been awarded scheduled compensation for a 5 percent loss of function of the right arm. Thus, the only way he can receive compensation for his industrial injury is to continue to reinjure his arm and increase the percentage of impairment.

The facts of this case appear to us to fall within the very limited situations contemplated by the Supreme Court in *Langbell v. Industrial Commission, supra*. For that reason Espey should have been awarded compensation for an unscheduled injury rather than for a scheduled loss of use of his arm.

The award is set aside.

WREN, P. J., and EUBANK, J., concur.